THOMAS SZOTT
Assistant United States Attorney
Wyoming Bar Number 7-5139
P.O. Box 668
Cheyenne, WY 82003
(307) 772-2124
Thomas.Szott@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| Plaintiff, | **Criminal No. 16-CR-19-J** |
| **v.** | |
| **SCOTT MICHAEL LEWIS** and **GILBERT WAYNE WILES, JR.,** | |
| Defendants. | |

---

### Government's Response to Defense Pretrial Motions

---

### I.      Introduction

On February 27, 2014, Defendant Scott Michael Lewis landed an unregistered airplane at the Yellowstone Regional Airport in Cody, Wyoming.  Defendant Gilbert Wayne Wiles was the front-seat passenger.  After Lewis and Wiles left the airplane in the hangar and went to a hotel for the night, a drug dog alerted to the airplane.  A detective obtained search warrants for the airplane and the Defendants' hotel room.  Neither the airplane nor the hotel room contained drugs, but in the hotel room, officers found approximately $259,717 cash and various other items.  The officers also seized evidence from the airplane.

On August 1, 2014, the United States instituted a civil forfeiture case in this court, docket number 14-CV-151-J.  Lewis is a party to the civil case; Wiles is not.  The civil case is currently stayed.

Subsequently, in a two-count indictment filed on January 14, 2016, the grand jury charged the Defendants with conspiracy to operate an unregistered aircraft (Count One) and operating an unregistered aircraft and aiding and abetting (Count Two).  (ECF No. 1).  Each Defendant entered a "not guilty" plea and was released pending trial.  (ECF Nos. 9, 18).

The Defendants have various pretrial motions pending before the court.  (ECF Nos. 37-45).  The court has scheduled a motions hearing for April 8, 2016, at 2:00 pm.  (ECF No. 31).  For the reasons set forth below, the Defendants' motions should be denied.

## II.      The Defendants' motion to suppress should be denied.

Lewis has filed a motion to suppress evidence from the airplane and the Defendants' hotel room, and Wiles has joined the motion.  (ECF Nos. 42, 45).  Lewis is seeking suppression on two grounds.  First, he challenges the reliability of the drug dog that alerted to the airplane.  (*See* ECF No. 42 at 3-4).  Second, even assuming the dog was reliable, Lewis argues the search warrant affidavit for the hotel room did not set forth adequate probable cause for the search.  (ECF No. 42 at 4-8).  This court should reject both arguments and deny the motion.

### a.  Exhibits and Witness

In connection with the Defendants' motion to suppress, the United States is submitting the following exhibits as attachments to this response.  Exhibit 1 is a copy of the search warrant, affidavit, and return for the airplane.  Exhibit 2 is a copy of the search warrant, affidavit, and return for the hotel room.  Exhibit 3 is a copy of the drug dog's January, 2014 certification.

The United States anticipates Officer Reece McLain, Powell Police Department, will be available at about 4:00 pm on April 8, 2016, to testify at the motions hearing.

**b.  Facts**

After the Defendants landed in Cody in the airplane and went to a hotel room for the night, Cody Police Detective Ron Parduba obtained search warrants for the airplane and the hotel room from a Wyoming circuit court judge.   The search warrant affidavits were identical in substance and set forth the following facts.

On February 27, 2014, at about 6:20 pm, Joel Simmons, the director of operations for Choice Aviation at the Yellowstone Regional Airport, called the Cody police to report a suspicious airplane that had arrived at the airport that day.  (Exh. 1 at 2).[1]  Detective Parduba contacted Simmons, and Simmons explained why he believed the airplane and its occupants were suspicious: the airplane had landed at the airport in November 2013 and the pilot flew out at night into bad weather after being told that he could not stay overnight with his plane (Exh. 1 at 2); the airplane was not currently registered (Exh. 1 at 2); in November 2013, when the plane arrived in Cody, all the windows were covered with shades and the pilot paid for services in cash with $100 bills (Exh. 1 at 2); on February 27, 2014, the occupants of the airplane did not call in by radio before landing, again immediately covered the plane's windows with sunshades, and left the sunshades in the windows even after the plane was moved into a hangar for the night (Exh. 1 at 2-3); after getting a hotel room, the airplane's occupants took several bags out of the plane, which Simmons thought was unusual for two people who were only staying for one night (Exh. 1 at 3); and the airplane could be used to move heavy payloads (Exh. 1 at 3).  Simmons

---

[1] Citations to the page numbers in Exhibit 1 refer to the original pagination of the affidavit, which begins at page 3 of Exhibit 1.  So the citation "(Exh. 1 at 2)" actually refers to page 4 of Exhibit 1.

3

also told Detective Parduba the airplane's occupants could fly under "visual flight rules," meaning they did not need to file a flight plan and no one could track the airplane. (Exh. 1 at 3). Before calling the police, Simmons had called the Aircraft Owners and Pilots Association tip-line and was told to contact local authorities. (Exh. 1 at 3-4).

Detective Parduba requested a drug-detection canine officer from the Powell Police Department. (Exh. 1 at 4). He then met Simmons at the airport and entered the Choice Aviation hangar. (Exh. 1 at 4). There, Parduba saw sunshades in the airplane's windows, and Simmons pointed out an apparent aftermarket hatch installed on the underside of the plane. (Exh. 1 at 4).

Powell police officer Reece McLain arrived at the hanger with his dog, "Zeke." Five weeks before, on January 21, 2014, Officer McLain and Zeke had been certified by the National Police Canine Association to detect the odor of marijuana, cocaine, methamphetamine, heroin, and MDMA. (Exh. 1 at 4). Officer McLain deployed Zeke around the airplane: Zeke sniffed the plane's door seals and sat down outside both the left-side and right-side doors. (Exh. 1 at 5). McLain then told Parduba Zeke had alerted to the odor of narcotics. (Exh. 1 at 5).

Detective Parduba interviewed Shelly Foos, who worked at Choice Aviation's front desk. Foos said she thought the airplane's occupants had three bags, including a duffle bag that appeared to be heavy. (Exh. 1 at 5). Parduba then spoke to the Holiday Inn manager Nate Nelson and asked if two males had been picked up at Choice Aviation earlier that day by the Holiday Inn Shuttle. (Exh. 1 at 5). Nelson said yes and gave Parduba the room number, which was listed under the name "Ken Howard." (Exh. 1 at 5).

Later, Cody police detective sergeant John Beck re-interviewed Nelson and learned that the airplane's occupants paid cash for their room, took their bags directly to their room after checking in, put a "do not disturb" sign on the door, and had not left the room. (Exh. 1 at 6).

4

The men had requested an HDMI cable, but when it was delivered, they opened the door only enough to slide the cable through and leave a tip.  (Exh. 1 at 6).  Nelson also said he deals with pilots often and felt the men's dress, demeanor, and age "were not indicative of pilots he has dealt with in the past." (Exh. 1 at 6).

Nelson also provided Sergeant Beck with information from shuttle driver Stan Stewart.[2] According to Stewart, the airplane's occupants had three bags with them.  (Exh. 1 at 6).  When Stewart tried to pick up a duffle bag, the occupants would not let Stewart touch it, even though they let Stewart help with the other bags.  (Exh. 1 at 6).

A Park County dispatcher checked the airplane on the Federal Aviation Administration website and found that the certificate for the plane had been suspended.  (Exh. 1 at 5-6). Detectives also learned that the phone number the airplane's occupants had given Choice Aviation and Holiday Inn was from Boise, Idaho, and appeared to be assigned to a "Trac phone." (Exh. 1 at 7).  Agents with the Division of Criminal Investigation and Immigration and Customs Enforcement could not find any record of a pilot's license in the name "Ken Howard" in the Boise area. (Exh. 1 at 7).

Along with the specifics of the investigation, Detective Parduba explained drug traffickers use airplanes to transport drugs and cash, take measures to conceal their identities, and use "Trac" phones to prevent tracing of the number back to an individual.  (Exh. 1 at 6-7).

**c.  Seized Evidence**

---

[2] The search warrant affidavits are somewhat ambiguous as to whether Sergeant Beck actually spoke with Stewart himself or merely obtained Stewart's information via Nelson, but Beck's report clarifies that Beck learned Stewart's information from Nelson, who had spoken with Stewart.  The affidavits must stand on their own, of course, but the most straightforward reading of the affidavits indicates Stewart's information came from Nelson, since Stewart's information is contained in a paragraph summarizing Beck's interview with Nelson.

Officers executed the search warrants on the hotel room and airplane on February 28, 2014, and seized various items as evidence.  From the hotel room, among other things, officers seized various electronic devices (including laptops, electronic storage devices, and cell phones); three fake Idaho driver's licenses bearing Lewis' photograph; and $259,717 in United States currency, most of it wrapped in vacuum-sealed bags.  From the airplane, among other things, officer seized paperwork and logbooks.  After the airplane was seized, a subsequent inventory search led to the seizure of a GPS unit from the airplane.

### d.  The Defendants must establish standing to challenge the airplane search

This court should reject the Defendants' suppression arguments on the merits, but as a predicate matter, both Defendants must establish their standing to challenge the airplane search. In the vehicle search context, "standing" is actually "a shorthand method of referring to the issue of whether the defendant's own Fourth Amendment interests were implicated by the challenged governmental action."  *United States v. Eylicio-Montoya*, 70 F.3d 1158, 1162 n.1 (10th Cir. 1995).  To establish standing to challenge an aircraft search, a defendant must "show lawful possession of the plane giving rise to a legitimate expectation of privacy."  *See United States v. Erickson*, 732 F.2d 788, 790 (10th Cir. 1984).  *Cf. United States v. Valdez Hocker*, 333 F.3d 1206, 1209 (10th Cir. 2003) ("To establish standing to challenge a car search, the defendant bears the burden of showing that he had a legitimate possessory interest in or [a] lawful control over the car.").  When considering standing in the automobile search context, the Tenth Circuit focuses on three non-determinative factors: "(1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the

suppression hearing that he had a legitimate possessory interest in the vehicle." *Valdez Hocker*, 333 F.3d at 1209.

In the present case, neither Defendant has asserted a legitimate possessory interest in, or lawful control over, the airplane. To the contrary, in his motion to dismiss, each Defendant claims he neither owned nor purchased the airplane and was not the airplane's pilot. (*See* ECF Nos. 38 at 4, 41 at 3).[3, 4] The Defendants might testify at the suppression hearing, of course, and satisfy the standing requirements set forth above – they might explain, for example, the nature of their relationship with Morris Point or assert ownership of the items seized from the airplane. But absent such testimony, and given the assertions in their motions to dismiss, neither Defendant necessarily has standing to contest the airplane search.

### e. The search warrant affidavits provided the issuing judge a substantial basis to believe evidence of drug trafficking was located in the airplane and the hotel room.

The Defendants' suppression arguments both question whether adequate probable cause supported the search warrants in this case. As the Tenth Circuit has explained:

> A magistrate judge's task in determining whether probable cause exists to support a search warrant "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."

*United States v. Artez*, 389 F.3d 1106, 1111 (10th Cir. 2004) (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)). A magistrate judge's decision to issue a warrant is entitled to great deference.

---

[3] Wiles does admit he "was acting as an agent of Morris Point when he paid for the plane." (ECF No. 38 at 4). The airplane is registered to an entity called Morris Point, LLC.

[4] The grand jury found, and the evidence produce in discovery indicates, Lewis was indeed the airplane's pilot. Lewis' contrary assertion in his motion may be a challenge to this finding, or it may be a drafting error.

*Gates*, 462 U.S. at 236.  Therefore, a reviewing court "need only ask whether, under the totality of the circumstances presented in the affidavit, the magistrate judge had a 'substantial basis' for determining that probable cause existed."  *Artez*, 389 F.3d at 1111.

In the present case, even without the positive drug dog alert, the search warrant affidavits set forth probable cause to believe evidence of drug trafficking would be found in the airplane or the hotel room.   The affidavits indicated the airplane's occupants (later identified as the Defendants): (1) were operating an unregistered airplane with a suspended certificate that was capable of carrying heavy loads; (2) were trying to conceal their identities and travels; (3) were using a name, "Ken Howard," which could not be linked to a pilot's license; (4) were trying to conceal the interior of their plane; (5) took an unusual amount of luggage from their plane to their hotel room, including a heavy duffle bag they would not let the shuttle driver touch; (6) did not want to open their hotel room door more than necessary; and (7) the plane had previously been flown out of the airport at night in bad weather when the pilot was told he could not stay with the plane overnight.  When combined with Detective Parduba's description of the behavior of drug traffickers and the suspicions of laypeople who had significant contact with pilots (*i.e.*, Simmons, Nelson, the Aircraft Owners and Pilots Association), these facts provided the issuing judge with a substantial basis for finding probable cause to believe the plane and hotel room contained evidence of drug trafficking.   Thus, even if there were no dog alert, the search warrants were valid, and the Defendants' motion should be denied.

Of course, Zeke's alert significantly strengthened the probable cause for both the airplane and the hotel.  As a general rule, a positive alert by a certified drug-detection dog gives officers probable cause to search an airplane without a warrant.  *See, e.g.*, *United States v. Ludwig*, 641 F.3d 1243, 1250-51 (10th Cir. 2011) ("[A] positive alert by a certified drug dog is generally

enough, by itself, to give officers probable cause to search a vehicle."); *United States v. Gooch*, 603 F.2d 122, 124-25 (10th Cir. 1979) (holding the automobile warrantless-search doctrine also applies to airplanes).   In the present case, therefore, Zeke's alert provided probable cause to search the airplane for drugs and evidence of drug trafficking.

As for the hotel room, Zeke's alert to the airplane strengthened the inference that drugs or evidence of drug trafficking would be found in the room as well.   In his motion, Lewis argues the affidavit did not establish probable cause to search the room, claiming the affidavit contained nothing "beyond pure speculation and threadbare suspicions . . . linking either Defendant or his hotel room to any illegal activity."   (ECF No. 42 at 5, 8).   Lewis further argues the "dog alert (if believed) indicated that drugs were in the plane and not in the hotel room."   (ECF No. 42 at 7).   But in fact, the affidavit indicated the Defendants took their luggage – including a heavy bag they would not let the shuttle driver touch – from the airplane to their hotel room.   The dog's alert to the airplane, which indicated the presence of drugs or the residual odor of drugs, raised a commonsense inference that the Defendants had taken a bag containing drugs or material tainted with the residual odor of drugs from their plane to their hotel room.   Thus, the alert to the plane increased the likelihood that the hotel room contained evidence of drug trafficking.

**f.   The search warrant affidavits truthfully reported the drug dog was certified – nothing more was required.**

In the Defendants' motion to suppress, Lewis suggests Zeke was not sufficiently reliable to support a finding of probable cause.   (*See* ECF No. 42 at 3-4).   Lewis quotes from *Florida v. Harris*, 133 S. Ct. 1050, 1057-58 (2013), in which the Supreme Court discussed a defendant's right – in a warrantless search case, *see id.* at 1054 – to test a dog's reliability at a probable-cause hearing.   (ECF No. 42 at 4).

Lewis does not explain the basis for his reliability challenge, but under controlling law, that challenge is necessarily narrow.  "A party seeking to suppress evidence bears the burden of proving the dog is unqualified."  *United States v. Clarkson*, 551 F.3d 1196, 1203 (10th Cir. 2009).

> As a general rule, a search warrant based on a narcotics canine alert will be sufficient on its face if the affidavit states that the dog is trained and certified to detect narcotics. We do not require affiants to include a complete history of a drug dog's reliability beyond the statement that the dog has been trained and certified to detect drugs. Under [*Franks v. Delaware*, 438 U.S. 154 (1978),] a court may look beyond the affidavit to see whether it omitted material information about a particular dog's reliability that would negate probable cause. This does not mean, however, that we must mount a full-scale statistical inquisition into the drug dog's history. Instead, courts typically rely on the dog's certification as proof of its reliability, given that canine professionals are better equipped than judges to say whether an individual dog is up to snuff. Of course, if a credentialing organization proved to be a sham, its certification would no longer serve as proof of reliability. In other words, the judicial task is limited to assessing the reliability of the credentialing organization, not individual dogs.

*United States v. Ruiz*, 664 F.3d 833, 840 (10th Cir. 2012) (citations and quotation marks omitted).  *Accord Harris*, 133 S. Ct. at 1057 ("If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.").

In the present case, the affidavit truthfully reported Officer McLain and Zeke were certified in narcotics detection by the National Police Canine Association.  (Exh. 1 at 4).  This was enough for the issuing judge to rely on the alert and issue the search warrants.  *See Ruiz*, 664 F.3d at 840.  And because Zeke was certified, this court can similarly presume his alert provided probable cause.  *See id.*

> **g.  Even if the search warrants were somehow defective, the executing officers relied upon the warrants in good faith, and therefore, the resulting evidence should not be suppressed.**

Even if this court were to find the search warrant affidavits defective, the resulting evidence should not be suppressed, because the executing officers relied on the warrants in good faith.  In *United States v. Leon*, 468 U.S. 897, 913 (1984), "the Supreme Court adopted a good-faith exception to the exclusionary rule where officers reasonably rely on a warrant issued by a detached and neutral magistrate later found to be invalid."   *Clarkson*, 551 F.3d at 1203 (quotation marks and brackets omitted).  The *Leon* exception does not apply in four situations in which an officer would not reasonably believe the warrant was properly issued:

> First, evidence should be suppressed if the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his reckless disregard of the truth. Second, the exception does not apply when the issuing magistrate wholly abandons her judicial role. Third, the good-faith exception does not apply when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. *Id.* Fourth, the exception does not apply when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid.

*United States v. Danhauer*, 229 F.3d 1002, 1007 (10th Cir. 2000) (quotation marks, brackets, and citations omitted).   The Tenth Circuit has also held the *Leon* exception does not apply to a warrantless search based on an alert by an unreliable dog.  *See Clarkson*, 551 F.3d at 1202-04.

In the present case, the *Leon* exception should apply.  As discussed above, even apart from Zeke's alert, Detective Parduba's search warrant affidavits outlined various suspicious circumstances involving the Defendants.  Thus, the affidavit was not "so lacking in indicial of probable cause as to render official belief in its existence entirely unreasonable."   The Defendants do not suggest Parduba somehow misled the issuing judge, that the issuing judge abandoned his neutral role, or that the warrant was facially deficient.  And *Clarkson* does not control here, because *Clarkson* involved a warrantless search in which the district court did not determine whether the dog was qualified, incorrectly holding the searching officer's reasonable

believe in the dog's reliability was all that mattered.  *See* 551 F.3d at 1198-1200, 1202-04.  In the present case, even without considering Zeke's alert, the search warrant affidavits set forth sufficient indicia of probable cause to pass muster under *Leon*.

Therefore, even if this court were to find probable cause lacking, the executing officers acted in good-faith reliance on the search warrants.  The seized evidence should not be suppressed, and this court should deny the Defendants' motion.

### III.    The Defendants' motions to dismiss the Indictment should be denied.

Wiles filed a motion to dismiss the Indictment on March 23, 2016, and Lewis filed a similar motion two days later.  (ECF Nos. 38, 41).  Though styled as motions to dismiss "for insufficient evidence," the Defendants are apparently seeking to dismiss the Indictment for "failure to state an offense" under Federal Rule of Criminal Procedure 12(b)(3)(B)(v).

In evaluating the Defendants' motions, this court should apply the Tenth Circuit's established standards:

> An indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense. Challenging an indictment is not a means of testing the strength or weakness of the government's case, or the sufficiency of the government's evidence. Rather, an indictment should be tested solely on the basis of the allegations made on its face, and such allegations are to be taken as true.

*United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006) (quotation marks, citations, and brackets omitted).  In the present case, as discussed below, both counts of the Indictment satisfy these standards.  This court should therefore deny the Defendants' motions.

### a.  Overview of 49 U.S.C. § 46306(b)(6)(A)

Title 49, United States Code, Section 46306 criminalizes knowing and willful violations of certain aircraft registration and other requirements.  As a predicate matter, § 46306 "applies

only to aircraft not used to provide air transportation."  *See* §§ 46306(a), 40102(a)(5) (defining "air transportation").  Section 46306(b) sets forth various offenses.  As pertinent here, a person violates § 46306(b)(6)(A) if he "knowingly and willfully operates or attempts to operate an aircraft eligible for registration under section 44102 of this title knowing that . . . the aircraft is not registered under section 44103 of this title."   Thus, to convict a defendant under § 46306(b)(6)(A), the United States must prove the following elements:

1.  On or about the date in question;

2.  In the applicable judicial district;

3.  The defendant knowingly and willfully operated an aircraft;

4.  The aircraft was not used to provide "air transportation;"

5.  The aircraft was eligible for registration under 49 U.S.C. § 44102; and

6.  The defendant knew the aircraft was not registered under 49 U.S.C. § 44103.

*See* § 46306(a), (b)(6)(A).

**b.  The present Indictment is sufficient**

Both charges in the present Indictment rely on § 46306(b)(6)(A).  (*See* ECF No. 1). Count One alleges conspiracy to operate an unregistered aircraft, in violation of 18 U.S.C. § 371 and § 46306(b)(6)(A).  Count Two alleges the substantive offense of operating an unregistered aircraft, in violation of § 46306(b)(6)(A), along with aider-abettor liability under 18 U.S.C. § 2 and liability pursuant to *Pinkerton v. United States*, 328 U.S. 640 (1946).  Both counts pass muster under Rule 12(b)(3)(B)(v).

Count Two sufficiently states the substantive offense.  Count Two alleges:

> On or about February 27, 2014, in the District of Wyoming, the Defendants, **SCOTT MICHAEL LEWIS** and **GILBERT WAYNE WILES, JR.**, did knowingly and willfully operate an aircraft eligible for registration under 49 U.S.C. § 44102, namely, a Cessna 206 airplane bearing tail number N6214V, while not

13

using said aircraft to provide "air transportation" as defined by 49 U.S.C. § 40102(a)(5), and while knowing said aircraft was not registered under 49 U.S.C. § 44103, and the Defendants did knowingly aid and abet each other in the commission of said offense.

(ECF No. 1 at 5-6).   This charging language contains each of the essential elements of the offense, including date and venue.   *See* § 46306(a), (b)(6)(A).   The date element enables the Defendants to assert double jeopardy defenses.   Taken as true, the allegations in Count Two sufficiently set forth substantive violations of § 46306(b)(6)(A).

Arguing to the contrary, each Defendant claims he "did not own the plane; neither did he purchase the plane."   (ECF Nos. 38 at 4, 41 at 3).   But ownership is not an element under§ 46306(b)(6)(A).[5]   Therefore, a jury could convict either Defendant on Count Two whether he owned the airplane or not.

Wiles argues he was not the airplane's pilot and, therefore, he neither operated nor attempted to operate the airplane as required for liability under § 46306(b)(6)(A).   (ECF No. 38 at 4).   This is a fact question for a jury at trial, not for the court under Rule 12(b)(3)(B)(v), so Wiles' argument is misplaced.   But even assuming Wiles never operated nor attempted to operate the airplane, a jury could still convict him as an aider-abettor or under a *Pinkerton* theory.[6]   Thus, on its face, Count Two sufficiently charges Wiles under § 46306(b)(6)(A).

---

[5] A separate subparagraph, 49 U.S.C. § 46306(b)(5)(A), applies to an owner who "knowingly and willfully operates, attempts to operate, or allows another person to operate" an unregistered aircraft.   The grand jury did not charge either defendant under § 46306(b)(5)(A). (*See* ECF No. 1).

[6] Under *Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946), each member of a conspiracy is legally responsible for the foreseeable crimes of coconspirators committed in furtherance of the conspiracy.   *See United States v. Russell*, 963 F.2d 1320, 1322 (10th Cir. 1992).   In the present case, if a jury found Lewis and Wiles conspired to operate an unregistered aircraft and that Lewis foreseeably did so in furtherance of the conspiracy, the jury could convict Wiles of Count Two under *Pinkerton* even if Wiles never operated nor attempted to operate the airplane himself.

Lewis similarly argues he never admitted to piloting the airplane. (ECF No. 41 at 3). But in the indictment, the grand jury not only alleged Lewis operated the airplane on February 27, 2014, but specifically alleged he landed the airplane in Cody, Wyoming on that date. (ECF No. 1 at 5). Lewis can dispute this as a factual matter at trial, but not in the Rule 12(b)(3)(B)(v) context, where this court must accept the grand jury's allegations as true.

Each Defendant claims he "was not 'aiding and abetting' anyone in the commission of a crime against the United States." (ECF Nos. 38 at 5, 41 at 3). But again, this is a fact question for the jury at trial.

In a final attack on Count Two, each Defendant claims "the government offers no evidence that [he], while neither the owner of the plane, nor its pilot, had any reason to know that the planer was not duly registered." (ECF Nos. 38 at 5, 41 at 3). Once again, the Defendants are raising an issue for the trial jury. In the Rule 12(b)(3)(B)(v) context, this court must accept the grand jury's allegation that the Defendants knew the airplane was not registered. (*See* ECF No. 1 at 6).

While Count Two alleges the substantive offense, Count One charges the Defendants with conspiracy to operate an unregistered aircraft in violation of 18 U.S.C. § 371:

> From on or about December 11, 2012, through and including on or about February 28, 2014, in the District of Wyoming and elsewhere, the Defendants, **SCOTT MICHAEL LEWIS** and **GILBERT WAYNE WILES, JR.**, did knowingly, intentionally, and unlawfully combine, conspire, confederate, and agree with each other and with other persons unknown to the grand jury to commit an offense against the United States, that is, to willfully operate an unregistered aircraft, in violation of 49 U.S.C. § 46306(b)(6)(A).

(ECF No. 1 at 2). Following this charging language, Count One contains a series of paragraphs alleging Manner and Means and Overt Acts. (ECF No. 1 at 2-5).

To convict a defendant of a § 371 conspiracy offense, the United States must prove the following elements: "(1) there was an agreement to violate the law, (2) the defendant knew the essential objective of the conspiracy, (3) the defendant knowingly and voluntarily participated in the conspiracy, (4) an overt act was committed in furtherance of the conspiracy, and (5) the coconspirators were interdependent." *United States v. Bedford*, 536 F.3d 1148, 1156 (10th Cir. 2008). Here, the charging language, Manner and Means, and Overt Acts alleged in the Indictment contain each of the essential elements of the offense, including dates and venue. (*See* ECF No. 1 at 2-5). The dates enable the Defendants to assert double jeopardy defenses. Taken as true, the allegations in Count One sufficiently set forth the charged § 371 offense.

Wiles does not address Count One in his motion to dismiss, but Lewis argues, "the existence of an agreement to achieve unlawful objective - is absent." (ECF No. 41 at 4). Without analysis, Lewis asserts, "a charge of conspiracy requires specific intent" and, "the indictment does not support the elements required for conspiracy." (ECF No. 41 at 4).

These challenges are meritless. The charging language plainly alleges the Defendants agreed with each other and others to willfully operate an unregistered aircraft. (ECF No. 1 at 2). As noted above, the charging language and accompanying paragraphs set forth each element of the offense, including the *mens rea* elements. Lewis can contest the underlying facts at trial, but in the Rule 12(b)(3)(B)(v) context, Count One of the Indictment is sufficient.

In sum, both counts in the Indictment set forth the elements of the charged offenses, give the Defendants fair notice of the charges they face, and enable the Defendants to assert double jeopardy defenses. The Indictment is therefore sufficient, *see Todd*, 446 F.3d at 1067, and this court should deny the Defendants' motions to dismiss.

**IV.    The Defendants' motion(s) to sever should be denied.**

On March 23, 2016, Wiles filed a motion to sever the trial under Federal Rule of Criminal Procedure 14; Lewis apparently inserted his name and filed the same motion two days later. (*See* ECF Nos. 37, 40). Rule 14(a) provides: "If the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." For the reasons discussed below, the Defendants' motions should be denied.

As a general matter, "[t]here is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). "In particular, the preference in a conspiracy trial is that persons charged together should be tried together." *United States v. Zapata*, 546 U.S. 1179, 1191 (10th Cir. 2008) (quotation marks and brackets omitted). Therefore, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. A defendant seeking severance "must bear a heavy burden of showing real prejudice to his case." *United States v. Morgan*, 748 F.3d 1024, 1043 (10th Cir. 2014).

> The requisite showing of prejudice is not made by a complaint that one defendant is less culpable than another, or by an allegation that a defendant would have a better chance of acquittal in a separate trial, or by a complaint of the spill-over effect of damaging evidence presented against a codefendant. Rather, a defendant must show that he [would be] deprived of his right to a fair trial.

*Id.* (citation and quotation marks omitted).

In the present case, the Defendants offer various arguments in support of the requested severance. Some of these arguments are patently baseless or contravened by controlling precedent. None demonstrates the potential for real prejudice.

17

First, each Defendant speculates the other "may offer exculpatory testimony for him at a separate trial." (ECF Nos. 37, 40 at 2). Each further speculates that, unless the trials are severed and his trial is scheduled second, the other will assert his Fifth Amendment privilege instead of testifying. (*See* ECF Nos. 37, 40 at 2).

Severance is sometimes necessary for a defendant to obtain exculpatory testimony from a codefendant, but a defendant seeking severance on this basis must satisfy a three-part test. Specifically, the defendant must

> show that he would call the co-defendant at a severed trial, that the co-defendant would *in fact* testify, and that the testimony would be favorable to him. Under the second requirement of this test, more than a bald assertion that a co-defendant will testify at a separate trial is required; the unsupported possibility that such testimony might be forthcoming is considered insufficient to show prejudice. A defendant can not establish the willingness of a co-defendant to testify on his behalf if the co-defendant's offer is further conditioned on the co-defendant's case being tried first. Furthermore, under the third requirement, the defendant must show that more than a vague and conclusory statement of negligible weight or probative value would be given to demonstrate a co-defendant's testimony would be favorable.

*United States v. Espinosa*, 771 F.2d 1382, 1408 (10th Cir. 1985) (quotation marks, brackets, citations, and ellipses omitted).

In the present case, neither Defendant has satisfied these requirements. Each merely speculates the other "may" offer exculpatory testimony if the other's trial takes place first, without any showing that the other would in fact testify or what the testimony would be. (*See* ECF Nos. 37, 40 at 2-3). Because neither Defendant has made the required showings, this court should decline to sever the Defendants' trial on this basis.

Each Defendant raises further arguments under the heading of obtaining exculpatory testimony from the other. Each claims he has a constitutional right to call the other as a witness at his separate trial. (ECF Nos. 37, 40 at 3). Each claims this court could compel the other's

testimony via an immunity order under 18 U.S.C. § 6003(b)(1).  (ECF Nos. 37, 40 at 3).  Each further claims this court could confer immunity even without a § 6003 order, citing *Gov't of Virgin Islands v. Smith*, 615 F.3d 964, 967 (3d Cir. 1980), *abrogated by United States v. Quinn*, 728 F.3d 243 (3d Cir. 2013).  (ECF Nos. 37, 40 at 3).

Tenth Circuit precedent contravenes these arguments.  A defendant's right to present a defense does not displace a witness' Fifth Amendment privilege.  *See United States v. Serrano*, 406 F.3d 1208, 1215 (10th Cir. 2005).  A defendant cannot obtain a statutory immunity order for a witness under § 6003; only a United States attorney with proper approval can request such an order.  *See* § 6003(a), (b); *Serrano*, 406 F.3d at 1216-18.  And "courts have no inherent authority to grant a witness use immunity."  *Serrano*, 406 F.3d at 1217.  In this regard, the Defendants' reliance on the Third Circuit's *Smith* decision is misplaced.  Not only has the Third Circuit retreated from *Smith*, *see Quinn*, 728 F.3d at 252-57, but the Tenth Circuit explicitly rejected *Smith* more than thirty years ago.  *See Serrano*, 406 F.3d 1208; *United States v. Hunter*, 672 F.2d 815, 818 (10th Cir. 1982), *overruled on other grounds by United States v. Call*, 129 F.3d 1402, 1404 & n.2 (10th Cir. 1997).  This court should summarily reject the Defendants' arguments in this area.

Second, apart from his professed need to obtain the other's supposedly exculpatory testimony, each Defendant claims severance is appropriate because he is markedly less culpable than the other.  (ECF Nos. 37, 40 at 3-4).  Each claims severance would further judicial economy because he "should not have to sit through a trial in which most of the evidence does not concern him."  (ECF Nos. 37, 40 at 3-4).

These arguments lack merit.  Even in a complex case where defendants "have markedly different degrees of culpability, . . . severance is not necessarily required because less drastic

measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *United States v. Dazey*, 403 F.3d 1147, 1165 (10th Cir. 2005) (quoting *Zafiro*, 506 U.S. at 539) (quotation marks omitted).  In the present case, many of the grand jury's findings implicate both Defendants – for example, both were present when Wiles paid for the airplane, and both were in the airplane when Lewis landed it in Cody on two separate occasions.  (*See* ECF No. 1 at 4-5).  Their apparent partnership belies each Defendant's claim that he is markedly less culpable than the other.   As for judicial economy, neither Defendant cites any authority for his bizarre suggestion that two trials would be more economical than one.  This court should decline to sever the trial for these reasons.

Third, the Defendants claim they "will likely employ antagonistic defenses," (ECF Nos. 37, 40 at 4), but neither has made the necessary showings to warrant severance on this basis.

> A trial court must apply a three-step inquiry when considering an argument that a defendant will be prejudiced because he and a co-defendant will present defenses that are mutually exclusive. First, the court must determine whether the two defenses are so antagonistic that they are mutually exclusive. Second, because mutually antagonistic defenses are not prejudicial *per se*, the court must consider whether there is a serious risk that a joint trial would compromise a specific trial right or prevent the jury from making a reliable judgment about guilt or innocence. Third, if a defendant shows that his case satisfies the first two factors, the trial court must weigh the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration. . . . [T]he conflict between the defendants' defenses must be such that the jury, in order to believe the core of one defense, must *necessarily* disbelieve the core of the other.

*United States v. Jones*, 530 F.3d 1292, 1304 (10th Cir. 2008) (quotation marks, citations, and original ellipses omitted).  Here, though each Defendant asserts "there is a high likelihood of antagonistic defenses," neither suggests what those defenses might be.  (*See* ECF Nos. 37, 40 at 5).  Because neither Defendant has made the required showings, this court should decline to sever the trial on this basis.

Each Defendant offers a further reason for severance under the heading of antagonistic defenses. Suggesting the government may introduce the other's statements (*e.g.*, coconspirator statements), each Defendant predicts he will try to introduce the other's prior bad acts and convictions (if any) to impeach those statements. (*See* ECF Nos. 37, 40 at 5).

On different facts, this scenario might indeed raise a severance issue. If a coconspirator statement is admitted in evidence, the declarant's credibility may be impeached as if he had testified as a witness. *See* FED. R. EVID. 806. If the declarant has a qualifying prior felony conviction or conviction involving "a dishonest act or false statement," that conviction may be offered to impeach the declarant's credibility. *See* FED. R. EVID. 609. The severance issue may arise where the declarant is a non-testifying codefendant in a joint trial. Although his prior conviction may be admissible to impeach his credibility as a declarant, it would not be admissible against him otherwise, and its use as impeachment may unfairly prejudice his case. *See, e.g.*, *United States v. Robinson*, 783 F.2d 64, 67 (7th Cir. 1986). Courts have dealt with this problem in various ways, such as precluding the impeachment or offering a limiting instruction. *See id.* at 67-68.

In the present case, however, this problem is unlikely to surface. Based on information presently available, neither Defendant has a prior felony or other conviction that would be admissible for impeachment under Rule 609. This court can address any such issue if it arises, but severing the trial at this juncture would be premature.

Finally, each Defendant raises *Bruton v. United States*, 391 U.S. 123 (1968) as a basis for severance, (ECF Nos. 37, 40 at 5-6), but *Bruton* does not support the Defendants' position. *Bruton* and its progeny preclude the admission of a non-testifying codefendant's co-implicating confession at a joint trial unless the confession is appropriately redacted. *See, e.g.*, *Fox v. Ward*,

200 F.3d 1286, 1292 (10th Cir. 2000). But in the present case, because neither Defendant confessed, *Bruton* should not apply. To the extent the United States determines any of the Defendants' statements to law enforcement might implicate *Bruton*, the United States will properly redact those statements and propose appropriate limiting instructions. But this is no reason to sever the trial.

Under the *Bruton* heading, each Defendant predicts the United States will deprive him of his confrontation right by "us[ing] the unexplored and misleading hearsay statements of the co-defendant." (ECF Nos. 37, 40 at 6). Indeed, the United States may offer coconspirator statements by one or both Defendants under Federal Rule of Evidence 801(d)(2)(E). *Bruton* does not apply to such statements, however, so the Defendants' request for severance on this basis is groundless. *See United States v. Montgomery*, 582 F.2d 514, 518-19 (10th Cir. 1978).[7]

In sum, the Defendants' various arguments have failed to show any concrete possibility of real prejudice stemming from a joint trial. Thus, their request for severance should be denied.

## V.      The Defendants' "Motion in Limine 404(b) Evidence" should be denied.

Lewis filed a motion entitled "Motion in Limine 404(b) Evidence" on March 25, 2016, which Wiles joined the same day. (ECF Nos. 43, 45). In his motion, Lewis acknowledges the court's discovery order, ECF No. 11, which requires the United States to provide notice of Rule 404(b) evidence at least five working days before trial. (ECF No. 43 at 1). Lewis then identifies various items he characterizes as Rule 404(b) evidence and asks this court to "issue an order requiring the Prosecution to identify its plans to seek to introduce such evidence well in advance

---

[7] Each Defendant offers further, similarly meritless analysis under the *Bruton* heading. (*See* ECF Nos. 37, 40 at 8). Some of this analysis apparently includes boilerplate language not connected with the present case, *e.g.*, each Defendant's claim that "the government's argument will necessarily encompass the clearly inculpatory statements of the co-defendants indicating that they had knowledge and intent to distribute." (ECF Nos. 37, 40 at 7).

of the trial date." (ECF No. 43 at 2). This court should deny Lewis' motion or defer deciding the motion until the time of trial.

### a. Rule 404(b) Legal Standards

Rule 404 of the Federal Rules of Evidence governs character evidence, including crimes and other bad acts. Specifically, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R. EVID. 404(b)(1). However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." FED. R. EVID. 404(b)(2); *see United States v. Tan*, 254 F.3d 1204, 1208 (10th Cir. 2001) ("The list of proper purposes is illustrative, not exhaustive . . . ."). Although often viewed as a strong prohibition on evidence of uncharged misconduct, "Rule 404(b) is considered to be an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition." *Id.* (quotation marks omitted).

As the Tenth Circuit has summarized:

> Evidence is properly admitted under Rule 404(b) if four requirements are met: (1) the evidence [is] offered for a proper purpose under Fed.R.Evid. 404(b); (2) the evidence [is] relevant under Fed.R.Evid. 401; (3) the probative value of the evidence [is] not substantially outweighed by its potential for unfair prejudice under Fed.R.Evid. 403; and (4) the district court, upon request, instruct[s] the jury pursuant to Fed.R.Evid. 105 to consider the evidence only for the purpose for which it was admitted.

*United States v. Becker*, 230 F.3d 1224, 1232 (10th Cir. 2000) (citing *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988)). Although each requirement must be met, "[t]he standard for satisfying Rule 404(b) admissibility is permissive . . . ." *United States v. Parker*, 553 F.3d 1309, 1314 (10th Cir. 2009). And, "if the other act evidence is relevant and tends to prove a

material fact other than the defendant's criminal disposition, it is offered for a proper purpose under Rule 404(b) and may be excluded only under Rule 403." *Tan*, 254 F.3d at 1208.

"Rule 404(b) limits the admissibility of evidence related to other crimes or wrongs, but it only applies to evidence of acts extrinsic to the charged crime." *United States v. Irving*, 665 F.3d 1184, 1212 (10th Cir. 2011) (quotation marks and brackets omitted); *see also, e.g.*, *United States v. O'Brien*, 131 F.3d 1428, 1432 (10th Cir. 1997); *United States v. Lambert*, 995 F.2d 1006, 1007-08 (10th Cir. 1993). Therefore, subject to Rule 403 undue prejudice analysis, evidence of other bad acts intrinsic to the crime charged is not subject to Rule 404(b). *Irving*, 665 F.3d at 1212 (citing *Lambert*, 995 F.2d at 1007-08). "Other act evidence is intrinsic when the evidence of the other act and the evidence of the crime charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." *Lambert*, 995 F.2d at 1007. Put another way, evidence is intrinsic "if it [is] inextricably intertwined with the charged crime such that a witness's testimony would [be] confusing and incomplete without mention of the prior act." *United States v. Ford*, 613 F.3d 1263, 1267 (10th Cir. 2010) (quotation marks omitted).

### b. Discussion

When requested by defense counsel, and as required by the court's discovery order in the present case, the United States must "provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial . . . ." FED. R. EVID. 404(b)(2)(A). In his motion *in limine*, Lewis predicts the United States might offer evidence of a 2010 conviction. (ECF No, 43 at 1-2). Indeed, the United States hereby gives notice that it may offer evidence of Lewis' November 30, 2010 misdemeanor conviction in Humboldt County California Superior

Court and the facts and circumstances underlying that conviction.  For the reasons stated below, this evidence is admissible under the permissive Rule 404(b) standards.

Lewis' misdemeanor conviction stemmed from his apparent involvement with a marijuana smuggling group that was using a house in Eureka, California.  Officers obtained a search warrant for the house and seized about 180 pounds of marijuana, packaging equipment, and $261,122 in cash.  The officers initially detained Lewis and another man outside the house and eventually arrested four men (including Lewis) in connection with the house.  On November 30, 2010, Lewis pled guilty to violating California Health & Safety Code § 11366.5(a), a misdemeanor provision that provides:

> Any person who has under his or her management or control any building, room, space, or enclosure, either as an owner, lessee, agent, employee, or mortgagee, who knowingly rents, leases, or makes available for use, with or without compensation, the building, room, space, or enclosure for the purpose of unlawfully manufacturing, storing, or distributing any controlled substance for sale or distribution shall be punished . . . .

In the present case, evidence of Lewis' 2010 conviction and the underlying circumstances would be proper under Rule 404(b).  Among other things, the conviction and underlying circumstances – which involved a seizure of approximately the same amount of cash at issue in the present case – are relevant to Lewis' knowledge, motive, and intent in flying the unregistered aircraft.  Given what happened in 2010, the United States will argue Lewis knew large amounts of unexplained cash might be seized by law enforcement and lead to criminal charges.  Lewis therefore flew the unregistered aircraft and engaged in other behaviors (*e.g.*, using a false name) to mask his identity and insulate himself from potential liability in the event the cash was seized. The circumstances of Lewis' prior case, including evidence that some of the cash was wrapped in a similarly distinct manner, also indicate Lewis' knowledge of the $250,000 cash aboard the airplane in the present case.

The United States may offer additional evidence pursuant to Rule 404(b).  If so, the United States will provide appropriate notice before trial.  The United States may also supplement its notice regarding Lewis' 2010 conviction and the accompanying circumstances.

In his motion *in limine*, Lewis identifies specific categories of evidence he asserts are subject to Rule 404(b):

1. Cash or money order transactions.

2. Short take off device modification made to the plane.

3. Money found at the hotel room in Cody, Wyoming.

4. Off shore business titled Morris Point.

5. Dealings in New Mexico in the creation of the Morris Point business.

6. All information related to the 2010 California case.

7. Not announcing tail number of plane when speaking with radio tower.

8. Covering up windows of the plane when it is staged.

9. Flying in inclement weather.

(ECF No. 43 at 2).

But with the exception of the 2010 California case, none of the evidence Lewis identifies is subject to Rule 404(b).  Rather, this evidence is intrinsic to the charged offenses.  This evidence demonstrates the Defendants' continuous use of the airplane over the course of the conspiracy, the purported ownership of the airplane (which is relevant to various elements of the charged offenses), the Defendants' efforts to conceal their association with the airplane (which is relevant to the *mens rea* elements of the offense), and the Defendants' motive – or partial motive – in operating the airplane without registration (*i.e.*, to transport more than $250,000 with as little personal risk as possible).

26

Because this evidence is intrinsic, the United States need not provide notice of its intent to offer such evidence under Rule 404(b).  Furthermore, the United States need not, as Lewis requests, "identify its plans to seek to introduce such evidence."  The Defendants can, of course, contest the relevance of any evidence when it is offered.

Therefore, the Defendants' motion *in limine* should be denied without prejudice or deferred until the time of trial.

## VI.     The Defendants' motion regarding the sentencing guidelines should be denied.

Finally, the Defendants have filed similar (if not identical) motions in which they ask this court to determine how it will apply the advisory sentencing guidelines in the event of a guilty verdict.  (ECF Nos. 39, 44).  Borrowing analysis the United States originally provided in an email, each Defendant predicts USSG §2B1.1 will apply.  (ECF Nos. 39, 44 at 1-2).  Each Defendant then argues alternatively that the guideline is too harsh, that he should have a lesser guideline, or that this court should sentence him under 18 U.S.C. § 3553 instead.  (ECF Nos. 39, 44 at 2).  Each Defendant then asserts, "he needs to know what he faces in terms of sentencing for purposes of determining his best course of action and to effectuate his right to effective assistance of counsel."  (ECF Nos. 39, 44 at 2).

This court should decline to determine how it might apply the guidelines, however, because the issue is not ripe, and because the Defendants are essentially asking this court to issue an advisory opinion.  Federal district courts regularly deny defense requests for pre-conviction guidelines determinations on these grounds.  *See, e.g.*, *United States v. Williams*, No. 15-CR-0185 PJS/BRT, 2015 WL 5638051, at *1 (D. Minn. Sept. 24, 2015) ("[U]nless and until Williams is actually convicted of a crime . . . the question of whether Williams' prior conviction for third-degree arson qualifies as a 'crime of violence' will not be ripe for adjudication.");

*United States v. Thompson*, No. 12-CR-20656, 2012 WL 6214428, at *1 (E.D. Mich. Dec. 13, 2012) ("Because Defendant has not been convicted and has not pled guilty, it would be outside the scope of the federal judicial power for the Court to render an advisory opinion on the applicability of the career offender provision of the United States Sentencing Guidelines."); *United States v. Santana*, 761 F. Supp. 2d 131, 138-41 (S.D.N.Y. 2011); *United States v. Ware*, 709 F. Supp. 1062, 1063-64 (N.D. Ala. 1989).  In the present case, neither Defendant has cited any authority for the advisory opinion he seeks.  And neither Defendant has cited any authority for his contention that such an opinion is necessary "to effectuate his right to effective assistance of counsel."  (ECF Nos. 39, 44 at 2).  This court should therefore deny the Defendants' motions.

As a final note, the United States agrees with the Defendants' predictions that this court will apply §2B1.1 in the event of conviction.  Given the parties' apparent consensus on which guideline will likely apply, defense counsel have a framework within which to advise their clients about the potential application of the guidelines.

## VII.    Conclusion

For the reasons set forth above, the Defendants' pretrial motions should be denied

DATED this 6th day of April, 2016.

Respectfully submitted,

CHRISTOPHER A. CROFTS
United States Attorney


By:    _____*/s/ Thomas Szott*_____
THOMAS SZOTT
Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 6, 2016, the foregoing was electronically filed and consequently served on defense counsel.


_____ */s/ Thomas Szott*_____
For the United States Attorney's Office